Anthony CARUSO and Robert
Caruso, Plaintiffs,

v.

CITY OF COCOA, FLORIDA,
Defendant.

No. 600CV1631ORL22JGG.

United States District Court,
M.D. Florida.
Orlando Division.

May 1, 2003.

Thomas H. Yardley, Law Office of Thomas H. Yardley, Cocoa, FL, for Anthony Caruso, Robert Caruso, plaintiffs.

Michael J. Roper, Bell, Leeper & Roper, P.A., Orlando, FL, for City of Cocoa, Florida, defendant.

### ORDER

CONWAY, District Judge.

## I. INTRODUCTION

This cause comes before the Court for consideration of the Defendant's, the City of Cocoa, Florida, Motion for Summary Judgment on the Claim of Anthony Caruso (Doc. No. 26), filed on September 20, 2002, to which the Plaintiff, Anthony Caruso, responded (Doc. No. 46) on October 21, 2002; and the Defendant's Motion for Summary Judgment on the Claim of Rob-

ert Caruso (Doc. No. 29), filed on September 20, 2002, to which the Plaintiff, Robert Caruso responded (Doc. No. 47) on October 21, 2002. Having reviewed the motions and memoranda, this Court **GRANTS** the Defendant's Motions for Summary Judgment (Docs. No. 26 and 29) on the claims of Anthony and Robert Caruso.

## II. BACKGROUND

The Plaintiff, Robert Caruso, is a first generation Italian American employed by the City of Cocoa, Florida as a police officer.[1] The Co–Plaintiff, Anthony Caruso, is a second generation Italian American, and at all relevant times herein, was employed by the City of Cocoa, Florida as a police officer.[2] The Defendant, the City of Cocoa, Florida (hereinafter referred to as "the Police Department" or "the City" or "the City of Cocoa" or "the Defendant"), is a municipal corporation existing under the laws of the State of Florida.[3]

On January 22, 1996, the Plaintiff, Robert Caruso (hereinafter referred to as "Robert", "Robert Caruso", or "Plaintiff"), commenced employment with the Police Department as an Interim Professional Compliance Officer.[4] Shortly thereafter, Robert was assigned to the position of Professional Compliance Officer.[5] In that office, Robert was responsible for conducting internal affairs investigations, overseeing the Police Department's training program, and recruiting employees for the Police Department.[6]

On November 26, 1997, the Chief of the Police Department, David Crawford (hereinafter referred to as "Chief Crawford"), changed the title of Robert's job from Professional Compliance Officer to Inspector.[7] This change was in title only, and did not affect Robert's pay structure or benefits.[8]

On March 7, 1996, Robert's nephew[9], Anthony Caruso (hereinafter referred to as "Anthony", "Anthony Caruso", or "Plaintiff"), commenced employment with the Defendant as a police officer.[10] Because of marital problems with his estranged wife located in Ohio, however, Anthony voluntarily resigned his employment on August 15, 1998.[11] Shortly thereafter, Anthony submitted a request to rescind his resignation to the Police Department.[12] That request was granted, and Anthony was allowed to return to his employment in the same position, at the same rate of pay and rank as he had previously held.[13]

In the meantime, on or about December 19, 1996, Robert began having a sexual relationship with Theresa Hankins (hereinafter referred to as "Mrs. Hankins" or "Theresa Hankins"), the wife of fellow police officer, John Hankins (hereinafter re-

---

1. *See* Doc. No. 34, Ex. 19 at 1.

2. *See* Doc. No. 33, Ex 12 at 1.

3. *See* Amended Complaint (Doc. No. 6), ¶ 6 at 2–3; *see also* Answer (Doc. No. 10), ¶ 6 at 2.

4. *See* Joint Pretrial Statement (Doc. No. 78), ¶¶ 1–2 at 10.

5. *See id.*, ¶ 3 at 10.

6. *See id.*, ¶ 4 at 10–11.

7. *See* Affidavit of Chief David Crawford (Doc. No. 34), Ex. 27, ¶ 2 at 2; *see also* Joint Pretrial Statement (Doc. No. 78), ¶ 9 at 11.

8. *See id.; see also* Joint Pretrial Statement (Doc. No. 78), ¶ 9 at 11.

9. *See* Deposition of Anthony Caruso (Doc. No. 38) at 24.

10. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 29 at 14.

11. *See id.*, ¶ 32 at 15; *see also* Doc. No. 33, Ex. 6.

12. *See id.*, ¶ 33 at 15; *see also* Doc. No. 33, Ex. 7.

13. *See id.*

ferred to as "Officer Hankins").[14] It is undisputed that when this extramarital relationship commenced, Robert and Officer Hankins were working together in the same unit.[15] In fact, Robert was serving as the commander of the Police Department's SWAT Team, on which Officer Hankins was a member.[16] In addition, at the time of the affair, Robert was married to Dora Caruso.[17]

In the sixteen months following their first sexual encounter, Robert and Mrs. Hankins surreptitiously met at hotel rooms over much of Florida's east coast.[18] At some point, however, their relationship became too complicated, and Mrs. Hankins decided to terminate their love affair.[19]

Notwithstanding Mrs. Hankins intentions, Robert continued to pursue their relationship.[20] On one occasion, he appeared at Mrs. Hankins parents' house and repeatedly asked her to give him "a minute," but Mrs. Hankins refused to honor his request.[21] Dissatisfied, Robert allegedly followed Mrs. Hankins in his city owned vehicle through the streets of Cocoa and Rockledge, Florida.[22] In an affidavit, Mrs. Hankins describes the incident as follows:

> We were traveling pretty fast (about 65 miles/hour) with [Robert] traveling right beside me, screaming out his passenger window for me to talk to him—stop being stupid. I stopped [at] the payphone ...to call 911[and] Cocoa dispatch answered [and] started asking where it [the chase] started, etc ... [and] then I saw [Robert] coming toward me, so I hung up [and] jumped in my car. I went east on 520 where [Robert] was stopped [and] he got out of his car in the middle of 520, saying "Please talk to me." I turned right ... with [Robert] beside me again screaming at me to give him a minute. I ignored him [and] he kept yelling at me. I went straight ...[and] he turned left ... I knew he was going to use a side street to meet me ... so I went to ... call 911. An officer ... met me there and ... followed me home.[23]

On April 29, 1998, the Police Department received a complaint from Mrs. Hankins regarding Robert's behavior.[24] Therein, Mrs. Hankins alleged that Robert improperly used Department property to facilitate an extramarital adulterous affair with the spouse of a subordinate while on duty or while subject to duty.[25] In addition, Mrs. Hankins alleged that at the end of the affair, Robert utilized Department property to pursue her against her will.[26] These allegations were supported by a personal journal given to the Police Department, in which Mrs. Hankins kept de-

14. *See* Robert Caruso Deposition (Doc. No. 36) at 94; *see also* Diary of Theresa Hankins (Doc. No. 34), Ex. 9 at 2.

15. *See id.* at 105–106; *see also* Theresa Hankins Deposition (Doc. No. 40) at 12–13.

16. *See id.; see also* Theresa Hankins Deposition (Doc. No. 40) at 12–13.

17. *See id.* at 94.

18. *See generally* Diary of Theresa Hankins (Doc. No. 34), Ex. 9.

19. *See* Theresa Hankins Deposition (Doc. No. 40) at 15–16.

20. *See id.* at 16.

21. *See* Affidavit of Theresa Hankins (Doc. No. 34), Ex. 8 at 1; *see also* Theresa Hankins Deposition (Doc. No. 40) at 60–62.

22. *See generally id.; see also* Theresa Hankins Deposition (Doc. No. 40) at 60–62.

23. *Id.* at 2–4; *see also* Theresa Hankins Deposition (Doc. No. 40) at 60–62.

24. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 10 at 11–12.

25. *See* Doc. No. 34, Ex. 10 at 1–2.

26. *See id.*

tailed notes describing her love affair with Robert.[27] As a result, an internal affairs investigation was commenced, and Robert was placed on paid administrative leave on May 2, 1998.[28]

Shortly after Mrs. Hankins submitted her complaint, Chief Crawford assigned Captain Mark Klayman (hereinafter referred to as "Captain Klayman") of the Cocoa City Police Department to investigate her allegations.[29] During his investigation, Captain Klayman met with Mrs. Hankins on several occasions to discuss the state of affairs.[30] On their first meeting, Mrs. Hankins related that she and Robert had an extramarital relationship, and that she wanted to end it.[31] On their second meeting, Mrs. Hankins provided Captain Klayman with a taped statement of the events giving rise to her complaint.[32]

Because of the unsettling allegations giving rise to Mrs. Hankins' complaint, Captain Klayman advised Mrs. Hankins to avoid any contact with Robert.[33] In fact, on several instances, Captain Klayman allegedly warned Mrs. Hankins that she would be arrested if she contacted Robert.[34]

It is important to note that at the time of the internal investigation, Mrs. Hankins was separated from her husband, and living in an apartment in Rockledge, Florida.[35] For this reason, Captain Klayman briefed the Rockledge police department about Mrs. Hankins' complaint.[36] Thereafter, Mrs. Hankins claims that Captain Klayman began calling her "everyday." [37]

Notwithstanding Captain Klayman's admonitions, Robert made an unannounced visit to the residence of Mrs. Hankins on May 10, 1998.[38] When he arrived, Mrs. Hankins was visiting with Bart Caesar (hereinafter referred to as "Mr. Caesar"), a friend with whom she had recently been dating.[39] Because Mrs. Hankins wanted to have a private discussion with Robert, Mrs. Hankins feigned leaving for her mother's house.[40] Mr. Caesar departed, and Robert and Mrs. Hankins returned to her apartment to discuss their relationship.[41]

Upon entering the apartment, Mrs. Hankins called the Cocoa City Police Department in order to notify Captain Klayman "that [Robert] was there ... that he was invited there and that we were just discussing things." [42] The Police Department informed Mrs. Hankins that Captain Klayman was unavailable.[43] In response,

---

27. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 11 at 12; *see also* Doc. No. 34, Ex. 9.

28. *See id.,* ¶ 12 at 12.

29. *See* Theresa Hankins Deposition (Doc. No. 40) at 16–17.

30. *See id.* at 16–18.

31. *See id.* at 17.

32. *See id.* at 18.

33. *See id.* at 19 and 78–79.

34. *See id.*

35. *See id.* at 43.

36. *See* Deposition of Robert Caruso (Doc. No. 36) at 133–135.

37. Theresa Hankins Deposition (Doc. No. 40) at 19.

38. *See* Theresa Hankins Deposition (Doc. No. 40) at 43–44; *see also* Theresa Hankins Affidavit (Doc. No. 34), Ex. 21 at 1.

39. *See id.* at 43–45.

40. *See id.*

41. *See id.; see also* Theresa Hankins Affidavit (Doc. No. 34), Ex. 21 at 1–2.

42. *Id.* at 78; *see also* Theresa Hankins Affidavit (Doc. No. 34), Ex. 21 at 2.

43. *See id* at 53–54; *see also* Theresa Hankins Affidavit (Doc. No. 34), Ex. 21 at 2.

Mrs. Hankins requested Captain Klayman's pager number, but the dispatcher refused to disclose it.[44]

Approximately five minutes later, Captain Klayman called Mrs. Hankins at her residence.[45] Mrs. Hankins then reported that "she invited [Robert] in" and that "she is fine."[46] Captain Klayman replied by stating that "I thought I told you to stay away from him, [and] that this can do nothing but cause you trouble."[47] He then allegedly started yelling at her.[48] At some point during their conversation, however, the phone line became disconnected,[49] although this point is now in dispute. According to the Plaintiffs, Captain Klayman maliciously hung up the phone in order to create a scene and sabotage Robert's career with the Police Department.[50]

In any event, the disconnected phone line allegedly worried Captain Klayman and prompted him to call Rockledge law enforcement officials to investigate the situation.[51] In response, the Rockledge police department dispatched officers who surrounded Mrs. Hankins' apartment.[52] Two police officers parked their cars in front of the apartment and stood behind their vehicles with their guns drawn.[53] In

the back, an additional two officers were positioned with a shotgun.[54]

To alleviate the tense circumstance, Mrs. Hankins went outside to inform the officers that everything was all right.[55] When she exited the apartment, one of the officers (hereinafter referred to as "the responding officer") requested permission to enter Mrs. Hankins' residence to ensure that everything was safe and secure.[56] Mrs. Hankins consented, and as a result, she and the responding officer proceeded into her apartment.[57] The responding officer then searched the apartment, and engaged in a brief conversation with Robert.[58] Mrs. Hankins estimates that the responding officer remained in the apartment for approximately five minutes before they both departed so that she could prepare an affidavit reciting the events of the day.[59] That affidavit provides as follows:

> I was [at] home with a friend when [Robert] Caruso came to the door. I looked out the peephole [and] saw no one. I opened the door [and] Bob asked if I could give him a minute. I walked outside with him and spoke to him for about 5 minutes [and] told him that I could talk to him after my friend left. I

---

**44.** *See id.* at 53–54; *see also* Theresa Hankins Affidavit (Doc. No. 34), Ex. 21 at 2.

**45.** *See* Theresa Hankins Deposition (Doc. No. 40) at 59; *see also* Theresa Hankins Affidavit (Doc. No. 34), Ex. 21 at 2.

**46.** *Id.* at 45.

**47.** *Id.*

**48.** *See id.*

**49.** *See* Affidavit of Theresa Hankins (Doc. No. 34), Ex. 21 at 2; *see also* Theresa Hankins Deposition (Doc. No. 40) at 79–80.

**50.** *See* Deposition of Theresa Hankins (Doc. No. 4) at 45 & 59.

**51.** *See* Affidavit of Theresa Hankins (Doc. No. 34), Ex. 21 at 2; *see also* Deposition of Theresa Hankins (Doc. No. 40) at 45–46.

**52.** *See* Theresa Hankins Deposition (Doc. No. 40) at 46–47 and 79–80.

**53.** *See id.* at 46–47.

**54.** *See id.*

**55.** *See id.* at 47; *see also id.* 80.

**56.** *See id.; see also id.* at 80–81.

**57.** *See id.; see also id.* at 80–81.

**58.** *See id.; see also id.* at 80–81.

**59.** *See id.* at 49.

went for a ride [and] stopped at the store. [Robert] Caruso came into the store [and] asked if could talk to me then. I said yes. He asked where should we go [and] I told him my apartment. He came here [the apartment] and we talked ... We talked a little longer [and] I told him that I was calling Captain Mark Klayman [of the Cocoa City Police Department]. I tried getting Capt. Klayman's pager number, but dispatch wouldn't give it to me [and] wouldn't page him because I wouldn't give them my name. About 5 minutes later Capt. Klayman called [and] I told him what was going on. The phone went dead [and] Capt. Klayman got worried [and] called [the] Rockledge [Police Department].[60]

According to Mrs. Hankins, when she finished the affidavit, the police officers left the scene.[61]

Although Mrs. Hankins does not remember if the responding officer's weapon was drawn when he entered the apartment,[62] Robert's rendition of the facts suggests that it was. In that connection, he testified as follows:

A. He had a gun pointed. He asked me if I had any weapons, show my hands. I told him, I said, "I've got a pair of shorts on." I said, "I don't think the weapon I have on me is going to do you any good."

Q. What were you referring to there?[63]

&ast; &ast; &ast; &ast; &ast; &ast;

A. I was actually referring to my penis.

Q. Okay.

A. And he chuckled and told me to put my hands up. I put my hands up. He said, "Turn around." I spun around. He holstered his weapon and came inside [the apartment].[64]

&ast; &ast; &ast; &ast; &ast; &ast;

Q. And I said, "Well, as you can see, she's fine." And he said, "I want to talk to her." I said, "Fine." He said, "You need to come outside." I said, "Fine. I'll come with you." He said, "No, you're not going anywhere." I said, "All right. That's fine, too." So I sat on the couch.[65]

On May 29, 1998, Robert's internal affairs investigation was closed, and a report was issued to the Chief of Police.[66] The report provided that based upon the preponderance of the evidence, it was reasonable to conclude that Robert violated Section XIV.5, F2 of the City of Cocoa's Personnel Policy Manual, which prohibits "[i]mproper or unauthorized use ... of city property, vehicles, and/or equipment for personal use, personal gain, or for any other reason."[67] In that regard, the report stated as follows:

---

**60.** Theresa Hankins Affidavit (Doc. No. 34), Ex. 21 at 1–2.

**61.** *See* Theresa Hankins Deposition (Doc. No. 40) at 82.

**62.** In that regard, Mrs. Hankins testified:

Q. Okay. Do you recall if his weapon was drawn?

A. He had his hand on his gun when he came up the stairs, but when he went into the apartment, I can't remember if it was taken out or not. I don't think so.

*Id.* at 81.

**63.** Robert Caruso Deposition (Doc. No. 36) at 164.

**64.** *Id.* at 165.

**65.** *Id.* at 165.

**66.** *See* Joint Pretrial Statement (Doc. No. 78), ¶ 12 at 12.

**67.** Doc. No. 34, Ex. 10 at 2.

Inspector Caruso utilized his department issued vehicle to facilitate sexual relations and other activities surrounding the affair. Additionally, Inspector Caruso used the vehicle to pursue the complainant when she discontinued the relationship. Inspector Caruso chased the complainant through the cities of Cocoa and Rockledge, drove the city vehicle to her house and engaged in harassing behavior, drove the city vehicle to the complainant[']s mother's house and engaged in harassing behavior.[68]

The report also found that it was reasonable to conclude that Robert violated Section 210 III.1.a of the Cocoa Police Department's Policy, Procedure, and Rules Manual, which prohibits "conduct unbecoming an officer ... which would or does bring the department into disrepute or impairs the operation or efficiency of the department." [69] In that connection, the report provided as follows:

> Inspector Caruso, by his conduct on duty and off duty, before and during this investigation will reflect most unfavorably on the department. As a member of management, Inspector Caruso has violated a trust with his followers and leaders and therefor impairs the efficient operation of administering this organization.[70]

Based on the findings in the internal affairs report, Chief Crawford took disciplinary action against Robert on June 11, 1998.[71] The discipline consisted of a one week suspension without pay from Monday, June 15, 1998 through Friday, June 19, 1998, and the loss of take-home vehicle privileges for approximately three months.[72] Although the Police Department's Policy Manual contains an employee grievance procedure whereby the City Manager reviews all disciplinary actions, Robert did not appeal Chief Crawford's decision.[73] Despite their problems, Robert Caruso and Theresa Hankins married on October 9, 1998, and now live together as man and wife.[74]

On November 5, 1998, Robert submitted a request to transfer from his position as Professional Compliance Officer to Detective with the Criminal Investigations Division.[75] Prior to making that request, Robert was never told by any representative of the Police Department that his position would be eliminated.[76] Robert professed that the reason for his application for transfer "was to advance his career by becoming eligible to take promotional exams." [77]

Following Robert's application for transfer, Chief Crawford recommended that, in the event a transfer was granted, Robert's pay be increased to reflect his years of experience in law enforcement.[78] On November 30, 1998, Robert's transfer application was accepted at the increased rate of pay recommended by Chief Crawford.[79]

A few months after Robert's transfer, Chief Crawford promoted Wesley Alexan-

---

**68.** *Id.*

**69.** *Id.* at 3.

**70.** *Id.*

**71.** *See* Doc. No. 34, Ex. 13 at 2.

**72.** *See id.; see also* Joint Pretrial Statement (Doc. No. 78), ¶ 15 at 12–13.

**73.** *See* Joint Pretrial Statement (Doc. No. 78), ¶¶ 16–17 at 13.

**74.** *See* Deposition of Theresa Hankins (Doc. No. 40) at 6.

**75.** *See* Joint Pretrial Statement (Doc. No. 78), ¶ 19 at 13.

**76.** *See id.,* ¶ 20 at 13.

**77.** *Id.,* ¶ 21 at 13.

**78.** *See id.,* ¶ 22 at 13–14.

**79.** *See id.,* ¶ 23 at 14.

der, an African–American police officer, to the position of Corporal.[80] This position was filled without taking applications, conducting interviews, or any other kind of process.[81] "He was just picked ... It was strictly a Wesley is our next Corporal." [82]

Apparently, the position of Corporal is exempt from the provisions of the City of Cocoa's Collective Bargaining Agreement.[83] For this reason, Corporals are appointed and serve at the sole discretion of the Chief of Police.[84] According to Chief Crawford, Wesley Alexander was not appointed to the position of Corporal because of his race.[85] Instead, "Alexander was promoted ... based upon his excellent work performance and [the Chief's] assessment that he would be a good supervisor." [86]

In and around the time of Alexander's promotion, the Plaintiffs claim that they experienced intense anti-Italian sentiment.[87] On one occasion, for example, they were allegedly referred to as "hot-headed guineas" and "Italian Muscle." [88] Furthermore, in a separate instance, when Robert and another police officer were discussing the tenure of Eric Liff, a Jewish American police chief who preceded Chief Crawford, Robert was allegedly told that he was brought to Cocoa because he was "involved in the New York mafia" and that

"every smart Jew has to have an Italian on his side for muscle." [89] Finally, the Plaintiffs contend that they were discriminated against because they were not allowed to wear an insignia of the Italian American Police Officers Association even though other officers were permitted to wear insignias representing other fraternal groups.[90]

In 1999, Anthony Caruso was promoted to the position of Narcotics Agent.[91] From there, he transferred to the position of Detective.[92] Anthony continued his employment with the Police Department as a Detective until March 29, 2002, when he voluntarily resigned in order to accept a position as a Federal Air Marshal.[93] His letter of resignation provided as follows:

> CHIEF CRAWFORD,
>
> PLEASE ACCEPT THIS LETTER AS MY OFFICIAL LETTER OF RESIGNATION. AS YOU KNOW I WAS ACCEPTED FOR THE POSITION AS A FEDERAL AIR MARSHALL [SIC]. MY LAST DAY WITH THE CITY OF COCOA WILL BE FRIDAY MARCH 29, 2002. IT HAS BEEN A PLEASURE WORKING UNDER YOUR COMMAND. I WANT TO THANK YOU FOR THE TRAINING AND EXPERIENCE YOU AND THE COCOA

---

80. *See* Affidavit of Police Chief David Crawford (Doc. No. 34), Ex. 27, ¶ 14 at 8.

81. *See* Deposition of Barbara Matthews (Doc. No. 52) at pgs. 45–46.

82. *Id.*

83. *See* Affidavit of Police Chief David Crawford (Doc. No. 34), Ex. 27, ¶ 14 at 8; *see also* Robert Caruso Deposition (Doc. No. 37) at 216.

84. *See id.; see also* Robert Caruso Deposition (Doc. No. 37) at 216.

85. *See id.*

86. *Id.*

87. *See generally* Doc. No. 33, Ex. 11 at 2–4.

88. *Id.* at 3.

89. *Id.*

90. *See* Doc. No. 34, Ex. 19 at 1; *see also* Doc. No. 33, Ex. 12 at 1.

91. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 34 at 15–16.

92. *See id.,* ¶ 34 at 16.

93. *See id.,* ¶ 35 at 16; *see also* Doc. No. 33 at Ex. 8.

POLICE DEPARTMENT HAS GIVEN ME. THE DECISION TO LEAVE WAS VERY DIFFICULT BECAUSE I CONSIDER THE COCOA POLICE DEPARTMENT AND ITS MEMBERS MY HOME AND FAMILY.[94]

To date, Robert Caruso continues to work for the Police Department in the position of Detective in the Criminal Investigations Division.[95]

On November 22, 1999, Robert and Anthony filed an EEOC Charge of Discrimination against the Police Department.[96] Robert's Charge of Discrimination provided as follows:

I am a first generation Italian American. I am employed by the City of Cocoa, as a police officer. I have been subjected to a racially hostile environment. I have been called a "hot-headed guinea", a member of the "Italian Mafia", the Italian muscle and other offenses. I was denied a promotion in February, 1999. I complained to the Chief of Police, but no remedial action was taken. I was prohibited from wearing the insignia of the Italian American Police Officers Association, although other fraternal groups could.[97]

Anthony's Charge of Discrimination contained identical allegations.[98]

The EEOC issued Robert a dismissal and Notice of Right to Sue on September 8, 2000.[99] Anthony's dismissal and Notice of Right to Sue was issued on September 17, 2000.[100]

On December 7, 2000 the Plaintiffs filed the instant lawsuit against the Police Department.[101] Count One [102] alleges that the Police Department unlawfully arrested, searched, and seized Robert Caruso in violation of the Fourth and Fourteenth Amendments to the United States Constitution.[103] Count Two asserts that the Police Department took adverse action against Robert Caruso for his association with Theresa Hankins in violation of the First and Fourteenth Amendments to the United States Constitution.[104] Count three alleges that the Plaintiffs were subjected to discriminatory discipline on account of their race and color in violation of Title VII of the Civil Rights Act of 1964 (Title VII).[105] Count four asserts that the Plaintiffs were denied a promotion on account of their race and color in violation of Title VII.[106] And finally, Count five alleges that the Plaintiffs were subjected to a hostile work environment in violation of Title VII.[107]

This Court will now consider these causes of action under the summary judgment standard of review.

---

94. Doc. No. 33 at Ex. 8.

95. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 24 at 14.

96. *See* Joint Pretrial Statement (Doc. No. 78), ¶¶ 25 & 38, at 14 & 16.

97. Doc. No. 34, Ex. 19 at 1.

98. *See* Doc. No. 33, Ex. 12 at 1.

99. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 26 at 14.

100. *See id.,* ¶ 38 at 16.

101. *See id.,* ¶ 26 at 14.

102. In their Amended Complaint (Doc. No. 6), the Plaintiffs divide their claims into three counts. For the convenience of the reader, and to better analyze the Plaintiffs' allegations, this Court has separated the Plaintiffs' lawsuit into five counts.

103. *See* Amended Complaint (Doc. No. 6) at 3–7.

104. *See id.*

105. *See id.* at 7–10.

106. *See id.*

107. *See id.*

## III. STANDARD OF REVIEW.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it is one that might affect the outcome of the case. *See id.* The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those materials that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant satisfies this requirement, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To meet this burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings." Fed.R.Civ.P. 56(e). Nor may the non-moving party rely on a mere scintilla of evidence supporting their position. *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). Rather, for a court to find a genuine issue for trial, the non-moving party must establish, through the record presented to the court, that it is capable of providing evidence sufficient for a reasonable jury to return a verdict in its favor. *See Cohen v. United Am. Bank*, 83 F.3d 1347, 1349 (11th Cir. 1996). When a court considers whether or not to enter summary judgment, it views all of the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir.1993).

## IV. LEGAL ANALYSIS

### A. THE FOURTH AMENDMENT CLAIM

Robert Caruso asserts that his encounter with the Rockledge Police Department on May 10,1998 constituted an unlawful seizure in violation of the Fourth and Fourteenth Amendment of the United States Constitution, providing a basis for a section 1983 action against the City of Cocoa.[108]

The Defendant argues that Robert Caruso's claim is fatally flawed because the activity which allegedly resulted in a violation of Robert's Fourth Amendment rights was not the result of actions or omissions attributed to a "final decision-maker" or "policymaker" acting on behalf of the Police Department, a prerequisite for municipality liability under section 1983.[109]

### 1. GENERALLY

#### (a) Title 42 § 1983

In order to bring a claim under 42 U.S.C. § 1983, a Plaintiff must demonstrate that he or she suffered a deprivation of rights, privileges, or immunities secured by the Constitution or other federal laws by one acting "under color of any state statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia." 42 U.S.C. § 1983.

The courts have construed this statute to preclude municipal liability "for constitutional deprivations on the theory of re-

---

**108.** *See* Doc. No. 47 at 1–8.

**109.** Doc. No. 29, ¶ 4 at 4; *see also* Doc. No. 31 at 20–22.

spondeat superior." *Oladeinde v. Birmingham*, 230 F.3d 1275, 1295 (11th Cir. 2000). Instead, municipalities "may be held liable only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." *Id.; see also Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir.2002) ("a local government may only be held liable under Section 1983 if action pursuant to official ... policy of some nature caused a constitutional tort ... [a]nd, [o]nly those municipal officers who have final policymaking authority may by their actions subject the government to § 1983 liability"); *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir.1996) ("Municipalities may be sued under 42 U.S.C. § 1983 if an official policy or custom of the municipality violates constitutional requirements... Only those officials who have final policymaking authority may render the municipality liable under § 1983"); *Morro v. City of Birmingham*, 117 F.3d 508, 510 (11th Cir.1997) ("Municipal liability under 42 U.S.C. § 1983 may be premised upon a single illegal act by a municipal officer only when the challenged act may fairly be said to represent official policy, such as when that municipal officer possess final policymaking authority over the relevant subject matter").

■ "An official represents government policy if he or she has final policy making authority." *Oladeinde*, 230 F.3d 1275 at 1295. "Whether an official is a final policymaker is a question of state law to be determined by the trial court." *Thomas v. Roberts*, 261 F.3d 1160, 1172 (11th Cir.2001). In general, however, final policy making authority is lacking when an official's decisions are subject to meaningful administrative review. *See Oladeinde*, 230 F.3d 1275 at 1295; *see also Morro*, 117 F.3d 508 at 514 ("a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review"); *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir.1997) ("This Court's ... decisions have consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review"). In other words, the "opportunity for meaningful review will suffice to divest an official of any policy making authority." *Oladeinde*, 230 F.3d 1275 at 1294.

### (b) Title 42 U.S.C. § 1983 and the Fourth Amendment

While 1983 provides a "broad remedy for violations of federally protected rights" it confers no substantive rights. *Penn v. City of Miami*, 1999 WL 1050059, *6 (S.D.Fla. Sept. 7, 1999) 1999 U.S. Dist. Lexis 22242, *17(internal citations and quotations omitted); *see also Almand v. Dekalb County*, 103 F.3d 1510, 1512 (11th Cir.1997) ("Section 1983 creates no substantive rights; it merely provides a remedy for deprivations of federal statutory and constitutional rights").

Accordingly, a "plaintiff seeking relief under the statute must bring a § 1983 claim in conjunction with some other statute or constitutional provision that provides substantive rights." *Penn*, 1999 WL 1050059 at *6, 1999 U.S. Dist. Lexis 22242 at *17(internal citations and quotations omitted). In this instance, the underlying ground for Robert's claim is the Fourth Amendment to the United States Constitution.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. amend IV.

■ It is well settled that claims "of false arrest or false imprisonment fall within the rights protected by the Fourth Amendment's guarantee against unreasonable seizures and the Fourteenth Amendment's guarantee against deprivations of liberty without due process of law." *Penn*, 1999 WL 1050059 at *6, 1999 U.S. Dist. Lexis 22242 at * 18; *see also Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996) ("A detention on the basis of false arrest presents a viable section 1983 action. [Thus], [w]here a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983 for false imprisonment based on a detention pursuant to that arrest").

## 2. APPLICATION OF THE LAW

■ Assuming, without deciding, that the City of Cocoa, through the actions of Captain Klayman, violated Robert Caruso's Fourth Amendment Rights by causing the Rockledge Police Department to unlawfully search and/or seize his person, this Court finds that Robert's claim is fatally flawed because he has failed to raise a genuine issue of material fact with respect to the issue of municipal liability.

Robert Caruso has not identified an official policy of the City of Cocoa which resulted in the allegedly unlawful search and seizure; nor has he identified a pervasive and well-settled custom or practice responsible for the allegedly unlawful search and seizure. Finally, Robert has failed to identify an official deemed to represent the City of Cocoa's policy who participated in the allegedly unlawful search and seizure. *See Penn*, 1999 WL 1050059 at *18, 1999 U.S. Dist. Lexis 22242 at *54–

55 (finding that the plaintiff failed to raise genuine issue of material fact with respect to a Fourth Amendment claim brought under § 1983 where there was no showing that a policy, custom, or policymaker was behind the allegedly unlawful conduct).

While Robert Caruso charges that Captain Klayman's improper conduct was the catalyst for the City of Rockledge's allegedly unlawful search and seizure, he has failed to identify evidence indicating that Captain Klayman was a final policymaker for the City of Cocoa. Moreover, Robert has failed to identify evidence indicating that a final policymaker ratified or affirmed Captain Klayman's decision to call the Rockledge Police Department. To the contrary, in Robert Caruso's Memorandum in Opposition to the Defendant's Motion for Summary Judgment, Robert states that "[o]nly Cocoa Police Captain Klayman spoke with Theresa Hankins. The only officer who knew that there was no cause to enter the apartment was Cocoa Police Captain Klayman." *See* Doc. No. 47 at 7. These deficiencies in Robert's § 1983 claim are problematic in light of the following testimony provided by Chief Crawford:

> I did not have any involvement in the decision to contact the City of Rockledge on May 10, 1998, in order to ask them to check on Theresa Hankins. I believe that under the circumstances, Captain Klayman acted appropriately, but he did not consult with me or seek my approval prior to making that contact with the City of Rockledge. Captain Klayman is in a position subordinate to that of the Chief of Police, and does not have the authority to make final decisions or policy on behalf of either the City of Coca or the Cocoa Police Department.

Affidavit of Chief David Crawford (Doc. No. 34), Ex. 27, ¶ 17 at 9–10.

Because courts generally reject the theory that subordinate officers are final poli-

cymakers for the purpose of municipal liability under § 1983, this Court finds Chief Crawford's statement together with the Plaintiff's failure to identify evidence that Captain Klayman had policy making authority, fatal to Robert Caruso's § 1983 claim *See, e.g., Lytle v. Doyle,* 326 F.3d 463, 472–73 (4th Cir.2003) (holding that captain was not final policymaker for § 1983 purposes because captains were sixth in the chain of command for the Police Department, far from the level where ultimate policy decisions were made); *Morton v. Little Rock,* 934 F.2d 180, 183–184 (8th Cir.1991) (holding that a police captain was not a final policymaker for purposes of § 1983 because there was no evidence indicating that city delegated policy-making authority to the police captain); *Stovall v. New York,* 1988 WL 249389, at \*3–4 (S.D.N.Y. Dec. 8, 1988) 1988 U.S. Dist. Lexis 18559, \*10 (refusing to recognize captain as final policymaker for § 1983 purposes because nothing in the record indicated that the captain had final policymaking authority).

## B. THE FREEDOM OF ASSOCIATION CLAIM

Robert Caruso maintains that his First Amendment right to association was violated because he was disciplined and/or demoted for engaging in an extramarital adulterous affair with the spouse of a subordinate officer under his command on the SWAT team.[110]

The Defendant contends that it is entitled to summary judgment on this claim because: (1) the First Amendment does not protect adulterous extramarital relationships; (2) there is no viable nexus between Robert's decision to engage in an extramarital relationship with Mrs. Hankins and the discipline which was imposed

upon him; (3) any right of a law enforcement officer to engage in an extramarital affair with a subordinate's spouse is outweighed by the Defendant's interest in insuring the efficient function of its law enforcement operations; and (4) Robert cannot identify any custom or policy which was the moving force behind the alleged violation so as to warrant the imposition of municipal liability under 42 U.S.C. § 1983.[111]

### 1. GENERALLY

■ The United States Constitution accords special protection to two different forms of association; namely, expressive and intimate association. *See McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir. 1994) (internal citations and quotations omitted). "Expressive association is the right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Gary v. City of Warner Robins,* 311 F.3d 1334, 1338 (11th Cir. 2002) (internal citations and quotations omitted). "Intimate association is the right to maintain certain intimate human relationships." *Id.* (internal citations and quotations omitted).

■ "At a minimum the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Cummings v. DeKalb County,* 24 F.3d 1349, 1354 (11th Cir.1994) (internal citations and quotations omitted). "Whether the right extends to other relationships depends on the extent to which those attachments share the qualities dis-

---

110. *See* Amended Complaint (Doc. No. 6), ¶ 8 at 3–7.

111. *See* Doc. No. 29, ¶ 2 at 1–2; *see also* Doc. No. 31 at 1–8.

tinctive to family relationships, such as relative smallness and seclusion from others in critical aspects of the relationship." *Id.* (internal citations and quotations omitted). Thus, a plaintiff can obtain "special protection for an asserted association right if [he or she] can demonstrate either that the asserted association closely enough resembles a family relationship to be protected by the right to intimate association, or that the purpose of the association is to engage in activities independently protected by the First Amendment." *Id.* (internal citations and quotations omitted).

## 2. THE FIRST AMENDMENT AND PUBLIC EMPLOYMENT

■ In order to prevail on a theory that public employment was terminated on account of an intimate association with another, a plaintiff must satisfy a three prong test. *See Chesser v. Sparks*, 248 F.3d 1117, 1124 (11th Cir.2001). First, the plaintiff must demonstrate a constitutional right to an association. *See id.* Second, the plaintiff must establish that he or she "suffered an adverse employment action for exercising that right." *Id.* Third, if both of these elements are satisfied, a court must use "the *Pickering* balancing test to determine whether the adverse employment action was permissible." *Id.*

■ The *Pickering* balancing test "requires the district court to balance the interest of the public employee in exercising his right of free ... association against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ross v. Clayton County*, 173 F.3d 1305, 1310 (11th Cir.1999). "The more a public employer's [adverse employment action] is necessary to the effective functioning of the office, the more [the adverse employment action] becomes justifiable, and thus the more likely it is that a court will find [the adverse employment action]

constitutionally permissible by finding the employer's interest outweigh the employee's interest in the *Pickering* balance." *Chesser*, 248 F.3d at 1125 n. 9 (internal citations and quotations omitted).

It has been stated that the *Pickering* test accommodates "the dual role of the public employer as a provider of services and as a government entity operating under the constraints of the First Amendment." *McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir.1994) (internal citations and quotations omitted). While allowing public employee associations to go unchecked would be inappropriate because some associations hinder the performance of public functions, giving employers free reign to regulate associations would also be unacceptable for it would allow employers to thwart relationships because they disagree with them rather than because the relationships disrupt the workplace functioning. *See id.* (discussing the *Pickering* balancing test in the context of the right to free speech).

In the Eleventh Circuit, when the Defendant is a law enforcement agency, the "employer's concerns can weigh into the *Pickering* balancing test even though there is no actual showing that those concerns would manifest themselves in the employee's individual situation" since "there is a special need to employ persons who act with good judgment and avoid potential conflicts of interest" in law enforcement agencies. *Ross*, 173 F.3d at 1311 (holding that *Pickering* balancing test tipped in favor of Georgia Department of Correction's decision to demote an employee after it was discovered that he lived with his brother, who was on probation at the time, because the department had a special need to employ persons who acted with good judgment to avoid potential conflicts of interest and because personal associations with active probationers could

undermine appropriate objectives of a law enforcement agency); *see also McCabe,* 12 F.3d 1558 at 1570–1573 (holding that *Pickering* balancing test tipped in favor of police chief's decision to transfer secretary to a less desirable position after she married a police officer under chief's command because the chief frequently handled sensitive and confidential matters involving personnel issues, many of which would involve the employee's husband).

## 3. APPLICATION OF THE LAW

### (a) Generally

Having reviewed the record, this Court finds that Robert Caruso has failed to satisfy all three prongs of the freedom of association test. Foremost, there is no authority from the Supreme Court or the Eleventh Circuit suggesting that the First Amendment affords protection to employees who engage in extramarital adulterous relationships. Second, there is no evidence in the record indicating that the Defendant took adverse employment action against Robert Caruso for engaging in an extramarital adulterous relationship. Finally, even if the Defendant took adverse action against Robert for exercising a viable constitutional right, this Court finds that such action was constitutionally permissible under the *Pickering* balancing test.

### (b) The Existence of a Valid Constitutional Right

■ Although the right to associate has been expanded to protect certain dating relationships, *see Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984), the Supreme Court has held that not every "kind of private sexual conduct between consenting adults is constitutionally insulated." *Bowers v. Hardwick,* 478 U.S. 186, 191, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Rather, insofar as the Due Process Clause of the Fourteenth Amendment is concerned, only those associations that are "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty" are entitled to heightened judicial protection. *Id.* at 191–192, 106 S.Ct. 2841. Applying the aforementioned formulations, the Supreme Court rejected the argument that the Due Process Clause of the Fourteenth Amendment protects the rights of homosexuals to engage in acts of consensual sodomy. *See id.* at 192–194, 106 S.Ct. 2841.

It is obvious to us that neither of these formulations would extend a fundamental right to homosexuals to engage in acts of consensual sodomy. Proscriptions against that conduct have ancient roots ... Sodomy was a criminal offense at common law and was forbidden by the laws of the original 13 States when they ratified the Bill of Rights. In 1868, when the Fourteenth Amendment was ratified, all but 5 of the 37 States in the Union had criminal sodomy laws. In fact, until 1961, all 50 States outlawed sodomy, and today, 24 States and the District of Columbia continue to provide criminal penalties for sodomy performed in private and between consenting adults. Against this background, to claim that a right to engage in such conduct is deeply rooted in this Nation's history and tradition or implicit in the concept of ordered liberty, is, at best facetious.

*Id.* at 192–194, 106 S.Ct. 2841 (internal citations and quotations omitted).

Although *Bowers* was not decided under the First Amendment right to intimate association, this Court finds that the Supreme Court's decision in that case has persuasive force here. Like sodomy, proscriptions against adultery have ancient roots. *See Marcum v. McWhorter,* 308 F.3d 635, 641–642 (6th Cir.2002). Under English canon law, for example, the eccle-

siastical courts punished adultery. *See id.* (citing 2 Charles E. Torcia, Wharton's Criminal Law § 210 (15th ed.1994)). Similarly, under the common law, brought to this country by American colonists, adultery was punishable if it was "open and notorious" as to amount to a "public nuisance." *Id.* (citing Torcia, *supra* ). Finally, the Puritans made adultery with a married woman a capital offense. *See id.* (citing Jeremy D. Weinstein, Note, *Adultery, Law, and the State: A History*, 38 Hastings L.J. 195, 225–26 (1986)). Even today, many states, including the State of Florida, continue to criminalize adulterous behavior.[112] *See id.*

In light of the historical treatment of adultery, this Court will apply the reasoning of *Bowers* to this case, and follow the Sixth Circuit's well-reasoned opinion in *Marcum v. McWhorter*, where the Court of Appeals rejected the theory that the First Amendment protects extramarital affairs on the grounds that the right "to engage in an intimate sexual relationship with the spouse of another cannot be said to be either deeply rooted in this Nation's history and tradition or implicit in the concept of ordered liberty." *Id.* at 642. "Adulterous conduct is the very antithesis of marriage and family" and, therefore, "such behavior cannot be compared to any of the fundamental matters of personal choice that lie at the core of traditional notions of individual liberty." *Id.* (internal citations and quotations omitted).

*(c) Adverse Employment Action*

 In the event that fornicating with the spouse of another is protected by the Constitution, this Court finds that Robert Caruso has failed to satisfy the second prong of the freedom of association test, which requires a plaintiff to demonstrate that he was subject to an adverse employment action on account of his protected association.

On April 29, 1998, the Defendant received a complaint from Mrs. Hankins regarding Robert Caruso's improper use of a city owned vehicle to facilitate a sexual escapade in and around North and Central Florida. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 10 at 11–12. After an investigation, it was determined that Robert Caruso used his City issued vehicle improperly for personal use, and in a manner unbecoming an officer. *See* Doc. No. 34, Ex. 10 at 1–4. Pursuant to the City of Cocoa's policy, using City property for personal reasons is punishable by discipline up to and including termination. *See* Doc. No. 34, Ex. 11 at 2. Similarly, engaging in conduct unbecoming an officer is punishable by discipline, up to and including termination. *See generally* Doc. No. 34, Ex. 12.

Robert Caruso has admitted that he used a City issued vehicle improperly in violation of the Defendant's personnel policies. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 12 at 12. In addition, Robert has admitted that he was formally disciplined only for using a city issued vehicle improperly, and for acting in a manner unbecoming an officer. *See Id.*, ¶ 18 at 13. Finally, it is undisputed that Robert maintained his relationship with Theresa Hankins during the internal affairs investigation and ensuing disciplinary process without being subjected to additional punishment.

---

**112.** *See* Fla. Stat. § 798.01—Living in open adultery:

Whoever lives in an open state of adultery shall be guilty of a misdemeanor of the second degree punishable as provided in § 775.082 or § 775.083. Where either of the parties living in an open state of adultery is married, both parties so living shall be deemed to be guilty of the offense provided for in this section.

In light of these admissions, and the lack of evidence controverting the Defendant's proof that Robert Caruso was disciplined only for improperly using city owned equipment, and conduct unbecoming an officer, this Court finds that there is no genuine issue of material fact with respect to the issue of causation. Accordingly, Robert Caruso's First Amendment claim fails on this ground as well.

*(d) The Pickering Balancing Test*

 In the event that the Defendant took adverse action against Robert Caruso for exercising a viable constitutional right to engage in an extramarital adulterous affair, this Court finds that such an action was constitutionally permissible under the *Pickering* balancing test. In other words, this Court finds that the interest of the Defendant in maintaining a harmonious work environment within its police department outweighs any interest of Robert in maintaining an extramarital adulterous relationship with the spouse of a subordinate officer.

District courts have long "recognized the critical importance of cohesiveness among fellow officers on a police force." *Mercure v. Van Buren Twp.,* 81 F.Supp.2d 814, 827 (E.D.Mich.2000). "Under these circumstances, where close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Id.* Indeed, in a "law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the [associations] of its officers than other government employers." *Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1293 (11th Cir.2000) (discussing the *Pickering* balancing test in the context of the right to free speech).

When a law enforcement officer engages in an extramarital affair with the spouse of a subordinate officer, such behavior could undermine the trust of both the public and fellow officers. *See Mercure,* 81 F.Supp.2d at 827. This is especially the case where both officers are working in the same unit, which in this instance was the SWAT team. Given the importance of teamwork in a law enforcement agency, and the high risks involved in conducting law enforcement operations (particularly those involving SWAT deployment), this Court finds that it would have been proper in this situation for the Defendant to take adverse action against Robert Caruso for engaging in an adulterous relationship with the spouse of a subordinate. *Id.* (upholding discharge of law enforcement officer for engaging in an adulterous relationship with the spouse of a fellow officer because the employer's interest in maintaining cohesiveness of the work environment outweighed any interest of the law enforcement officer).

*(e) Municipal Liability Under 42 U.S.C. § 1983*

Alternatively, this Court notes that the Defendant is not liable on the First Amendment claim because Robert Caruso has not identified an official policy, or pervasive and well-settled custom or practice, or a final policymaker responsible for the allegedly unlawful discipline and/or demotion.

Although Robert charges that the City can be held liable for Chief Crawford's actions, the Police Department's Policy Manual contains an employee grievance procedure whereby the City Manager ultimately reviews all disciplinary actions. *See* Joint Pretrial Statement (Doc. No. 78), ¶¶ 16–17 at 13. The "opportunity for meaningful review will suffice to divest an official of any policy making authority." *Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1294 (11th Cir.2000). In this

case, Robert did not file an appeal regarding the discipline imposed by Chief Crawford; accordingly, the City Manager did not review that determination. *See id.,* ¶ 16 at 13.

## C. THE DISCRIMINATORY DISCIPLINE CLAIMS

The Plaintiffs' next claim against the Defendant is for discriminatory discipline based on race and/or national origin in violation of Title VII.

The record reflects that in the course of Anthony Caruso's employment with the Defendant, he was subjected to a total of four disciplinary actions.[113] Specifically, Anthony was verbally counseled for: (a) incorrectly filling out a citation; (b) disobeying an order to turn in a report; (c) obtaining an official report from the Defendant's records and providing it to his attorney without making a public records request under Florida law; and (d) allowing his driver's license to be suspended.[114] It is undisputed that Anthony was never suspended, demoted, transferred, or subjected to any loss of pay or benefits in connection with these disciplinary actions.[115]

Likewise, the record reflects that in the course of Robert Caruso's employment with the Defendant, he was subjected to a total of four disciplinary actions.[116] Specifically, Robert was disciplined for: (a) utilizing a department issued vehicle improperly for personal use; (b) engaging in conduct unbecoming an officer [117] (c) failing to complete a "Use of Force" form or write a supplement in that regard; and (d) using obscene language in the presence of a supervisor in public.[118]

In connection with the first two charges, Robert was suspended for a week without pay, and he lost the use of his take-home vehicle for three months.[119] In connection with the later two charges, Robert was verbally counseled.[120]

The Defendant argues that it is entitled to judgment as a matter of law on the Plaintiffs' discriminatory discipline claim because the Plaintiffs cannot established that they were "treated differently" than similarly situated employees with respect to the terms and conditions of their employment.[121] In addition, the Defendant argues that the Plaintiffs have not been subjected to any adverse employment action or other conduct that is actionable under Title VII.[122]

### 1. GENERALLY

"To establish discrimination in discipline, just like showing discrimination in hiring, a plaintiff must first make out a prima facie case demonstrating: 1) that he belongs to a protected class under Title

---

113. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 36 at 16.

114. *See* Doc. No. 33, Ex. 10 at 1–4; *see also* Chief David Crawford's Affidavit (Doc. No. 34), Ex. 27, ¶ 16 at 9.

115. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 37 at 16.

116. *See* Doc. No 34, Ex. 13 at 1–2; *see also* Affidavit of Chief David Crawford (Doc. No. 34), Ex. 27, ¶ 9 at 6.

117. *See* Doc. No. 34, Ex. 13 at 1–2.

118. *See* Affidavit of Chief David Crawford (Doc. No. 34), Ex. 27, ¶ 9 at 6.

119. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 15 at 12–13.

120. *See* Affidavit of Chief David Crawford (Doc. No. 34), Ex. 27, ¶ 9 at 6.

121. Doc. No. 26, ¶ 2(b) at 2; Doc. No. 29, ¶ 3(b) at 3; *see also* Doc. No. 27 at 7–9; Doc. No. 31 at 16–17.

122. *See* Doc. No. 26, ¶ 2(a) at 2; *see also* Doc. No. 29, ¶ 3(a) at 2–3; Doc. No. 27 at 5–7; Doc. No. 31 at 14–16.

VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline."[123] *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir.2000). "Once a plaintiff makes a prima facie showing, the burden of going forward shifts to the employer who must provide a specific legitimate non-discriminatory reason for disciplining the employees differently." *Id.* "Finally the ultimate burden of persuasion rests with the plaintiff who must show that the proffered legitimate reasons for the different disciplinary actions were pretextual thereby permitting, but not compelling, the trier of fact to conclude that the employment action at issue was the product of illegal discrimination." *Id.*

In this case, it is undisputed that when the events giving rise to this claim occurred, the Plaintiffs belonged to a protected class under Title VII. It is also undisputed that the Plaintiffs were qualified for their jobs. Accordingly, to the extent that the prima facie case is of concern, this Court must only examine whether similarly situated employees engaged in the same or similar misconduct without receiving similar discipline.

### 2. SIMILARLY SITUATED EMPLOYEES

■ "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001). When conducting this analysis, the "most important variables ... and the most likely sources of different, but non-discriminatory treatment, are the nature of the offenses committed and the nature of the punishment imposed." *Jones v. Winn–Dixie Stores, Inc.*, 75 F.Supp.2d 1357, 1364 (S.D.Fla.1999). For this reason, a "claim of discriminatory discipline requires a showing that the misconduct for which the plaintiff was disciplined was 'nearly identical' to that engaged in by an employee outside the protected class and who has not been disciplined." *Id.* Indeed, "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges" the Eleventh Circuit requires "the *quantity and quality* of the comparator's misconduct [to] be nearly identical" to that of the Plaintiffs. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999) (emphasis added); *Silvera,* 244 F.3d at 1259 ("In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges"); *but see Alexander v. Fulton County*, 207 F.3d 1303, 1334 (11th Cir. 2000) (holding that "the law does not require that a 'similarly situated' individual be one that has 'engaged in the same or nearly identical conduct' as the disciplined plaintiff. Instead, the law only requires 'similar' misconduct from the similarly situated comparator"); *Anderson v. WBMG–*

---

**123.** In cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff has the option of showing either: "(a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against any other persons who engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *see also Jones v. Winn–Dixie Stores, Inc.*, 75 F.Supp.2d 1357, 1364 (S.D.Fla.1999) (accord). Because the Plaintiffs in this case have not argued that they did not violate work rules, this Court need only address whether such discipline was imposed in a discriminatory fashion.

*42*, 253 F.3d 561, 565 (11th Cir.2001) (accord).

With these general principles in mind, the Plaintiffs list the following employees as similarly situated:

| NAME | ACTION | DISCIPLINE |
|---|---|---|
| (1) Wesley Alexander—African American | Accused of sexual misconduct with a minor. | No internal investigation was performed, and he was not placed on administrative leave.[124] |
| (2) Al Mobley—African American | Accused of police corruption. | No internal investigation was performed, and no discipline was given.[125] |
| (3) MacKinley Smith—African American | Accused of sexual battery on a minor. | No internal investigation was performed, and he was not placed on administrative leave.[126] |
| (4) Bobby Jones—African American | (a) Accused of police corruption (e.g. possession of a controlled substance, trafficking of a controlled substance, used of a controlled substance, failure to properly handle evidence, sexual battery, fraudulently obtaining credit, unlawful use of social security numbers/fraud, and dereliction of duties).[127] | An internal investigation was performed, and findings were made that Jones violated policies of the Defendant by fraudulently obtaining credit through using social security numbers which were false or issued to other persons.[128] Based on these findings, the Chief of Police recommended termination.[129] After reviewing the findings, however, the City manager only issued a written reprimand.[130] |
| | (b) Accused of misusing a city vehicle to go back and forth to school. | Informally told to stop engaging in that act.[131] |
| (5) Mark Oenbrink—Caucasian | Accused of misusing a city vehicle to pick somebody up at the airport in Orlando. | One day suspension or written reprimand.[132] |
| (6) Officer Dellatore—Caucasian | Accused of being involved in a prank which included a vehicle chase and foot pursuit.[133] | No internal affairs investigation was conducted, but a verbal reprimand was issued.[134] |
| (7) Officer Ferrante—Caucasian | Accused of being involved in a prank which included a vehicle chase and foot pursuit.[135] | No internal affairs investigation was conducted, but a verbal reprimand was issued.[136] |

**124.** *See* Complaint (Doc. No. 6), ¶ 40(c) at 9; *see also* Deposition of Robert Caruso (Doc. No. 37) at 210–215.

**125.** *See id.*, ¶ 40(a) at 9; *see also* Deposition of Robert Caruso (Doc. No. 37) at 217–225.

**126.** *See id.*, ¶ 40(c) at 9; *see also* Deposition of Robert Caruso (Doc. No. 37) at 226–229.

**127.** *See* Rick Holt Deposition (Doc. No. 50), Ex. 1 at 1.

**128.** *See generally id.*, Ex. 1.

**129.** *See generally id.*, Ex. 2.

**130.** *See generally id.*, Ex. 3; *see also* Doc. No. 32, ¶ 4 at 14.

**131.** *See* Robert Caruso Deposition (Doc. No. 36) pgs. 117–118.

**132.** *See* Doc. No. 32, ¶ 1 at 15; *see also* Robert Caruso Deposition (Doc. No. 36) at 117.

**133.** *See* Deposition of Robert Caruso (Doc. No. 37) at 234.

**134.** *See* Doc. No. 32, ¶ 2 at 15.

**135.** *See* Deposition of Robert Caruso (Doc. No. 37) at 234.

**136.** *See id.*, ¶ 3 at 15.

| (8) Officer Washburn—Caucasian | Received death threats. | Provided with protection in light of death threats while Plaintiffs were not provided with protection despite receiving similar threats.[137] |
| --- | --- | --- |
| (9) Captain Hankins—Caucasian | Accused of compromising an investigation. | No internal affairs investigation, and no discipline.[138] |
| (10) Captain Klayman—Caucasian | Accused of making inappropriate and offensive comments during an investigation. | No internal affairs investigation, and no discipline.[139] |

■ Having reviewed the aforementioned list, this Court finds that none of the Plaintiffs' proposed comparators engaged in similar misconduct for the purpose of establishing a prima facie case of discriminatory discipline.[140]

With respect to Anthony Caruso's claim, no proposed comparator employees were accused of incorrectly filling out a citation, and/or disobeying an order to turn in a report, and/or obtaining an official report from the Defendant's records without making a public records request, and/or allowing a driver's license to expire.

Likewise, with respect to the claim of Robert Caruso, no proposed comparator employees were accused of failing to complete a "Use of Force" form, or using obscene language in the presence of a supervisor in public, or misusing city property in the manner in which Robert has admitted to utilizing it.

While some of the aforementioned employees were accused of improperly using city vehicles for personal use, on no occasion were they accused of using such property to facilitate a sexual escapade along the Florida coastline. This is a significant distinction in light of the Eleventh Circuit's requirement that the quantity and quality of a comparator's misconduct be nearly identical. *See, e.g., Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir.2000) (finding that Caucasian employee terminated for taking $10 from a cash register and replacing it with a signed I.O.U. until

**137.** *See id.,* ¶ 4 at 15.

**138.** *See id.,* ¶ 5 at 15.

**139.** *See id.,* ¶ 6 at 15; *see also* Doc. No. 34, Ex. 18 at 10.

**140.** At the outset, this Court rejects using Bobby Jones as a comparator with respect to his police corruption charge. The discipline imposed (a written reprimand) on Jones' police corruption charge was administered by the City Manager, and not Chief Crawford, the supervisor responsible for administering the Plaintiffs' discipline, who recommended discharge. Although the Plaintiffs could have filed an appeal to the City Manager regarding the discipline imposed by Chief Crawford, neither chose to pursue such review. *See* Joint Pretrial Statement (Doc. No. 78), ¶ 16 at 13. Under these circumstances, this Court finds that the different disciplinary measures cannot be compared. *See Jones v. Gerwens,*

874 F.2d 1534, 1541 (11th Cir.1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis"); *see also Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1261 (11th Cir.2001) ("differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination"); *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1312 n. 7 (11th Cir.1998) ("Different supervisors may have different management styles that—while not determinative—could account for the disparate disciplinary treatment that employees experience"); *but see Anderson v. WBMG–42,* 253 F.3d 561, 566 (11th Cir.2001) (rejecting the proposition that whenever two different supervisors are involved in administering the disciplinary actions, the comparators cannot as a matter of law be similarly situated for Title VII purposes).

the next day on her job was not similarly situated to an African–American employee who was accused of stealing from the cash register but had not been similarly disciplined because Caucasian employee admitted to having taken $10 from cash register, whereas African–American employee did not).

Moreover, even if this Court were to find such conduct was nearly identical, unlike Robert's situation, there is no evidence suggesting that any comparators were accused of conduct unbecoming an officer in connection with their use of City property. This also significantly distinguishes Robert's behavior from those of his proposed comparators. *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1313 (11th Cir.1998) (finding that plaintiff terminated for being insubordinate and unprepared was not similarly situated to other employee who came to work merely unprepared).

For these reasons, the Plaintiffs' discriminatory discipline claim must fail.

### D. THE FAILURE TO PROMOTE CLAIM

In support of their failure to promote claim, the Plaintiffs state the following:

> In the case at bar, Wesley Alexander, was just picked [to be Corporal]. He is a black officer. Normally, there is a memo posted and you put in your letter of intent. The rest of the corporal positions that were made, a memo was put out... The Problem with Mr. Alexander is that he had difficulties which should have precluded him from promotion. A child accused him of having sexual relations with her... This individual was promoted [because] Captain Smith demanded, a black supervisor.[141]

The Defendant argues that it is entitled to summary judgment on this claim because: (1) the Plaintiffs never sought the promotion at issue; (2) the Plaintiffs were not more qualified than Wesley Alexander, the African American candidate who was chosen for the position; and (3) the Defendant has presented an unrebutted legitimate, non-discriminatory explanation for the promotion.[142]

### 1. GENERALLY

"[T]o establish a prima facie case of discriminatory failure to promote, a plaintiff must prove: (1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir.2001). "Once these elements are established, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action." *Id.*

"If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination." *Id.* A "Plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated, and be sufficient to withstand a motion for judgment as a matter of law." *Id.* "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors." *Id.* "Those include the strength of the plaintiff's prima facie

---

**141.** Doc. No. 46 at 2–3 (internal citations and quotations omitted).

**142.** *See* Doc. No. 26, ¶ 2(a) at 1–2; *see also* Doc. No. 27 at 9–11; Doc. No. 29, ¶ 3(c) at 3–4; Doc. No. 31 at 17–20.

case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.*

## 2. THE PRIMA FACIE CASE

In this case, it is apparent that the Plaintiffs have established a prima facie case on their failure to promote claim. At the time of the promotion, they were members of a protected class, they were qualified for the promotion, and an equally qualified or less qualified employee was promoted in their place. This Court need not consider the fact that the Plaintiffs never sought the promotion at issue, or alternatively, that they were rejected for that position because the record reflects that there was no formal notice of the job's availability. *See Jones v. Firestone Tire & Rubber Co., Inc.,* 977 F.2d 527 (11th Cir. 1992).

 When "there is no formal notice of the job's availability ... an employer ... has a duty to consider all those who might reasonably be interested." *Id.* at 533 (internal citations and quotations omitted). "Accordingly, a plaintiff makes out a prima facie case—that is, he creates a presumption of discrimination and forces the employer to articulate legitimate reasons for his rejection—as long as he establishes that the company had some reason or duty to consider him for the post." *Id.* An employer "cannot avoid Title VII ... by showing that it incorrectly assumed that the plaintiff was uninterested in the job." *Id.* "When the plaintiff had no notice of or opportunity to apply for the job such a reason for rejection is legally insufficient and illegitimate." *Id.* (internal citations and quotations omitted).

## 3. THE LEGITIMATE NON-DISCRIMINATORY REASON

Since the Plaintiffs have established a prima facie case, the Defendant must rebut it with a legitimate non-discriminatory reason. *See Walker v. Mortham,* 158 F.3d 1177, 1184 (11th Cir.1998). Although this burden is not onerous, neither is it a mere formality. *See id.* Thus, "the defendant may not satisfy its burden by presenting a hypothetical reason for the employment decision in question; instead, it must raise a genuine issue of fact as to whether it discriminated against the plaintiff by making the decision." *Id.* "In other words, the defendant must clearly set forth, through the introduction of admissible evidence, the reason for its adverse employment decision, and that reason must be legally sufficient to justify a judgment for the defendant." *Id.*

 In this case, the Defendant's legitimate non-discriminatory reason for promoting Wesley Alexander was "his excellent work performance and [the Chief's] assessment that he would be a good supervisor." *See* Affidavit of Chief Crawford (Doc. No. 34), Ex. 27, ¶ 14 at 8.

 Although this rationale is largely subjective, it is a well established principle in the Eleventh Circuit that subjective factors "can constitute a legally sufficient, legitimate, nondiscriminatory reason." *Denney,* 247 F.3d 1172 at 1185 (internal citations and quotations omitted).

Indeed, subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy... Personal qualities ... factor heavy into employment decisions concerning supervisory or professional positions. Traits such as common sense, good judgment, originality, ambition, loyalty, and tact

often must be assessed primarily in a subjective fashion... yet they are essential to an individual's success in a supervisory or professional possession. It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation. To phrase it differently, subjective reasons are not the redheaded stepchildren of proffered discriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons ... A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion.

*Id.* at 1185–1186 (internal citations and quotations omitted).

Applying this framework to the facts in this case, the Court finds that Chief Crawford's proffered rationale for promoting Wesley Alexander satisfies the Defendant's burden of producing a legally sufficient nondiscriminatory reason for its decision.

### 4. PRETEXT

Although the Defendant has produced a satisfactory legitimate non-discriminatory reason for promoting Wesley Alexander, the Plaintiffs have failed to identify evidence indicating that such rationale was a pretext for unlawful discrimination.[143] In other words, the Plaintiffs have failed to identify evidence indicating that Chief Crawford did not promote Wesley Alexan-

der because of his excellent work performance and his assessment that he would be a good supervisor. In that regard, Anthony Caruso testified as follows:

Q. And did Wesley Alexander possess the minimum qualifications for that job?

A. After a year of probation, yes, he did.

Q. Are you aware of anything that would have made him ineligible for the job as corporal?

A. No, I'm not.

\* \* \* \* \* \*

Q. How has Wesley Alexander's job performance been in the position of corporal?

A. I don't know. I've never worked under him.

Q. So you have no information on that?

A. No.

Anthony Caruso Deposition (Doc. No. 39) at 177 & 179.

This Court finds this want of evidence determinative on the Plaintiffs' failure to promote claim because "[a]bsent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on ... subjective criteria will, rarely, if every prove pretext under Title VII or other federal employment discrimination statutes." *Denney,* 247 F.3d 1172 at 1185.

### E. HOSTILE WORK ENVIRONMENT CLAIM

In support of their Hostile Work Environment Claim, the Plaintiffs call attention

---

**143.** Instead, the Plaintiffs aver that summary judgment should be denied because the "Defendant has failed to produce a legitimate non-discriminatory reason for the challenged employment action[,]" and it is only when such reason is produced, that a plaintiff then has the ultimate burden of proving the reason

to be a pretext for unlawful discrimination. Anthony Caruso's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 46) at 3; *see also* Robert Caruso's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 47) at 12.

to the following incidents that allegedly occurred during their employment with the Defendant.

| ALLEGED PERPETRATOR | DETAILS OF ALLEGED INCIDENT |
| --- | --- |
| (1) Mark Oenbrink | Made a comment to Robert Caruso, in the presence of Anthony Caruso, to the effect that Robert had been brought to the City by Eric Liff (who is Jewish), because he was "involved in the New York Mafia" and "every smart Jew has to have an Italian on his side for muscle." [144] |
| (2) Captain Klayman | (a) Made a comment to Theresa Hankins during the internal affairs investigation of Robert Caruso to the effect that Robert was a "hot-headed guinea." [145] |
| | (b) Made a comment to the *Space Coast Press*, that the SWAT team, of which Robert Caruso was in charge, was disbanded because of its "Gestapo-like" tactics.[146] |
| (3) Gary Thomas | Made a comment to Chief Crawford that "Anthony and Robert Caruso were involved with the New York Mafia and ran illegal activities with black officers within the department." [147] |
| (4) Captain Smith | Made a comment to Officer Tim Suspanic inquiring if he was "going to jump on the Italian bandwagon and sue the City." [148] |
| (5) Chief Crawford | (a) Made a comment to Sergeant Ray Racca stating "Aren't you Italian? Why don't you get together with the Carusos and have a 'sit down.' " [149] |
| | (b) Allowed Anthony Caruso to work in an undercover drug operation even though Corporal John Hankins allegedly divulged Anthony's identity to a confidential informant involved in the case. According to Anthony, two of the confidential informants involved in that case are now dead.[150] |
| (6) Jim Frazier | Told Anthony Caruso that he could not wear an insignia of the Italian American Police Officers Association.[151] |
| (7) Former City Manager Terry Seawell | Made a comment to the *Florida Today* newspaper that an inquiry being conducted by Robert Caruso into allegations of police brutality against his nephew, Anthony Caruso, was a "cover up" because Robert Caruso was Anthony's uncle.[152] |

The Defendant argues that it is entitled to summary judgment on this claim because the Plaintiffs are "unable to establish that [they were] subjected to harassment, based upon national origin, which was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment." [153] In the alternative,

144. Doc. No. 33, Ex. 11 at 5; *see also* Amended Complaint (Doc. No. 6), ¶¶ 36 & 44 at pp. 8 & 10; Doc. No. 33, Ex. 12 at 1; Doc. No. 34, Ex. 19 at 1.

145. *Id.; see also* Amended Complaint (Doc. No. 6), ¶¶ 36 & 44 at pp. 8 & 10; Doc. No. 33, Ex. 12 at 1; Doc. No. 34, Ex. 19 at 1.

146. *Id.* at 4.

147. *Id.* at 5; *see also* Amended Complaint (Doc. No. 6), ¶¶ 36 & 44 at pp. 8 & 10; Doc. No. 33, Ex. 12 at 1; Doc. No. 34, Ex. 19 at 1.

148. *Id.* at 6.

149. *Id.* at 6.

150. *See id.*

151. *See* Amended Complaint (Doc. No. 6), ¶¶ 37 & 45 at pp. 8 & 10; *see also* Doc. No. 33, Ex. 12 at 1; Doc. No. 34, Ex. 19 at 1; Anthony Caruso Deposition (Doc. No. 39) at 195–196.

152. Doc. No. 33, Ex. 11, at 4.

153. Doc. No. 26, ¶ 3 at 2; *see also* Doc. No. 27 at 11–15; Doc. No. 29, ¶ 5 at 4; Doc. No. 31 at 22–25.

the Defendant argues that the Plaintiffs "unreasonably failed to take advantage of those preventative or corrective opportunities provided by Defendant in order to avoid harm otherwise." [154]

## 1. GENERALLY

To establish a prima facie hostile work environment claim the Plaintiffs must show that: (1) they belong to a protected group; (2) that they were subject to harassment based on a protected characteristic, such as national origin; (3) that the harassment was unwelcome; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir.2002).

Because it has already been established that the Plaintiffs are members of a protected class, this Court will only address the remaining four elements of the Plaintiffs' hostile work environment claim.

## 2. "BASED ON A PROTECTED CHARACTERISTIC"

From the outset, this Court finds that at least three of the incidents reported above have nothing whatsoever to do with the Plaintiffs' Italian American heritage.

---

**154.** *Id.,* ¶ 4 at 2; *see also* Doc. No. 27 at 15–16; Doc. No. 29, ¶ 6 at 4; Doc. No. 31 at 25–26.

**155.** Although Anthony Caruso does not consider the term "Gestapo-like" tactics offensive to Italian Americans, his uncle, Robert, finds it absolutely detestable. In that connection, he testified as follows:
Q. You think that the phrase "Gestapo-like tactics" is offensive to Italian–Americans because Hitler and Mussolini were together in World War II?

Foremost, Captain Klayman's alleged comment, that the SWAT Team was disbanded because of "Gestapo-like" tactics, is inapposite. The Gestapo was the secret state police in Nazi Germany operating "against persons suspected of treason or sedition and often employing under handed and terrorist methods." Webster's Ninth New Collegiate Dictionary 515 (9th ed.1991). It had nothing to do with Italian American filiation. Even the Plaintiff, Anthony Caruso, has recognized this.

Q. Are you contending that the phrase "Gestapo-like tactics" is somehow disparaging to your Italian–American heritage?

A. I myself am not contending that. It was just added in there for the, you know, the harassment portion of the lawsuit.

Q. But there is no claim that the phrase "Gestapo-like" is offensive and disparaging to -

A. Oh, it's offensive, but—oh, I'm sorry.

Q. offensive or disparaging to Italian–Americans?

A. No.[155]

Anthony Caruso Deposition (Doc. No. 38) at 126.

Moreover, this Court finds Terry Seawell's alleged comment regarding Robert Caruso's investigation into allegations of police brutality against Anthony Caruso

A. Absolutely.
Q. Okay. Do you know if there were any Italians in the Gestapo?
A. Not a clue.
Q. I doubt there were.
A. I can tell you that Italians had their own secret police.
Q. It wasn't the Gestapo, was it?
A. I can't tell you. I don't know.
Robert Caruso Deposition (Doc. No. 37) at 196–197.

unrelated to a protected characteristic. Indeed, as Anthony Caruso acknowledged in his deposition, implying that an uncle would cover up for the acts of his nephew is a nondiscriminatory allegation that could be made against members of any ethnicity.

Q. Would you agree with me that the comment by Terry Seawell or the comment that's attributed to Terry Seawell does not in and of itself involve your Italian–American heritage?

A. I agreed with that before.

Q. Why is it that you claim that that comment is somehow disparaging to your Italian–American heritage?

A. That was put in there as part of the harassment issue in the lawsuit, as far as the claim went.

\* \* \* \* \* \*

Q. You're not claiming that the comment by Terry Seawell was disparaging to your Italian–American heritage.

A. No.

Anthony Caruso Deposition (Doc. No. 38) at 125.

Finally, there is no evidence suggesting that Chief Crawford's decision to allow Anthony Caruso to continue working undercover even though his identity had allegedly been divulged was based upon a protected characteristic. To the contrary, Anthony Caruso contends that Chief Crawford's decision to leave him on that assignment was motivated by his EEOC complaint and ensuing litigation. In that connection, he testified as follows:

Q. The last incident that you have here on your interrogatory answers makes reference to a drug operation that you were involved in . . .

A. That's correct.

Q. And during the course of this investigation . . . your identification was revealed . . .

A. Yes, it was.

Q. And you requested that the commander—Captain Brown, rather, look into it, and the [C]hief indicated it wasn't going to go any further.

A. That's correct.

Q. Is it your contention that that somehow is motivated by virtue of your Italian–American heritage?

A. I think it was motivated as a result of the lawsuit that had been filed or the EEOC complaint that has been filed by myself.[156]

Anthony Caruso Deposition (Doc. No. 38) at 149–150.

Based on the foregoing, this Court will not consider the aforementioned incidents in its analysis of the Plaintiffs' hostile work environment claim.

### 3. UNWELCOMENESS

The record reflects that most of the disparaging remarks cited by the Plaintiffs occurred outside of their presence. In fact, both of the Plaintiffs admit [157] that the only disparaging remark they overheard directly came from Lt. Mark Oenbrink, who allegedly stated that Robert had been brought to the City of Cocoa by Eric Liff (who is Jewish), because he was "involved in the New York Mafia" and "every smart Jew has to have an Italian on his side for muscle." [158]

---

**156.** While arguably this statement could form the basis of a retaliation claim under Title VII, the Plaintiffs never pled such a cause of action. *See generally* Amended Complaint (Doc. No. 6); *see also* Anthony Caruso's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 46); Joint Pretrial Statement (Doc. No. 78).

**157.** *See* Robert Caruso Deposition (Doc. No. 37) at 208; *see also* Anthony Caruso Deposition (Doc. No. 38) at 153.

**158.** Doc. No. 33, Ex. 11 at 5; *see also* Amended Complaint (Doc. No. 6), ¶¶ 36 & 44 at pp. 8 & 10; Doc. No. 33, Ex. 12 at 1; Doc. No. 34, Ex. 19 at 1.

■ Even though many of the remarks cited by the Plaintiffs were inappropriate, if made, this Court finds that to the extent Plaintiffs were not directly aware of the remarks, the unwelcomeness prong is unsatisfied. *See Hudson v. Norfolk S. Ry.,* 209 F.Supp.2d 1301, 1317 n. 20 (N.D.Ga. 2001) ("Another component of a hostile environment is the unwelcomeness of the conduct. To the extent that plaintiff was not directly aware of much of [the] conduct and sought out information about [the] remarks from others, the unwelcomeness prong is diminished").

This is not a case where the Plaintiffs were continually subjected to offensive remarks directed at their person. To the contrary, as Anthony Caruso's deposition testimony revealed, the Plaintiffs had to ferret out information about offensive comments made at the Cocoa Police Department in order to bolster their hostile work environment claim.

### 4. "SEVERE OR PERVASIVE"

*(a) Generally*

■ The fourth prong of a hostile work environment claim requires the plaintiff to demonstrate that the harassment was severe or pervasive from both a subjective and objective standpoint. *See Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276 (11th Cir.2002). In other words, to be actionable, the harassment "must result in both an environment that a reasonable person would find hostile or abusive, and an environment that the victim subjectively perceives ... to be abusive." *Id.* (internal citations and quotations omitted).

It has been stated that the severe or pervasive prong "tests the mettle of most ... harassment claims." *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 583 (11th Cir.2000) (internal citations and quotations omitted). Properly applied, it will "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Indeed, "[r]equiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere general civility code." *Gupta,* 212 F.3d 571 at 583.

*(b) Subjective Viewpoint*

The record in this case raises significant doubts about whether the Plaintiffs subjectively viewed the City of Cocoa Police Department as an environment hostile to Italian Americans.

As discussed previously, three of the incidents the Plaintiffs complain of have nothing to do with Italian American heritage. Moreover, only one of the disparaging remarks listed occurred within the presence of the Plaintiffs. Finally, the Plaintiffs have admitted that they use similar disparaging terms themselves when referring to persons of Italian American filiation. In that connection, Robert Caruso testified as follows:

Q. Have you yourself ever used, either at work or in your social life outside work, ever used any words that are commonly thought of as derogatory or insulting towards people of Italian–American descent?

A. Italian–American?

Q. Yes.

A. Absolutely.

Robert Caruso Deposition (Doc. No. 36) at 154.

Likewise, Anthony Caruso testified as follows:

Q. Have you ever used those terms, guinea and wop, in referring to other Italian–Americans?

A. Yes.

Q. And you've had other Italian–Americans use those words towards you, and you didn't' find them offensive?

A. Well, no, no, I didn't find them offensive at all.

Anthony Caruso Deposition (Doc. No. 38) at 146.

Having reviewing the facts of this case, and the testimony entered by the Plaintiffs, this Court finds that no reasonable jury could conclude that Anthony and Robert Caruso subjectively perceived the City of Cocoa Police Department as hostile and/or abusive to Italian Americans. This conclusion is bolstered by Anthony Caruso's resignation letter, in which he states:

CHIEF CRAWFORD,

PLEASE ACCEPT THIS LETTER AS MY OFFICIAL LETTER OF RESIGNATION. AS YOU KNOW I WAS ACCEPTED FOR THE POSITION AS A FEDERAL AIR MARSHALL [SIC]. MY LAST DAY WITH THE CITY OF COCOA WILL BE FRIDAY MARCH 29, 2002. IT HAS BEEN A PLEASURE WORKING UNDER YOUR COMMAND. I WANT TO THANK YOU FOR THE TRAINING AND EXPERIENCE YOU AND THE COCOA POLICE DEPARTMENT HAS GIVEN ME. THE DECISION TO LEAVE WAS VERY DIFFICULT BECAUSE I CONSIDER THE COCOA POLICE DEPARTMENT AND ITS MEMBERS MY HOME AND FAMILY.[159]

An individual who subjectively views his place of employment as an abusive and hostile work environment ordinarily would not refer to it as "home" and "family" in a resignation letter.

*(c) Objective Viewpoint*

In evaluating the objective severity of a harassment claim, courts should consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir.2002) (internal citations and quotations omitted). As the Supreme Court has noted, an abusive working environment is created only "when the workplace is permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotations omitted). The utterance of a mere epithet is insufficient to meet this standard. *Miller*, 277 F.3d at 1277.

Having reviewed the record, this Court finds that the Plaintiffs are incapable of satisfying the objective portion of the severe and pervasive prong on their hostile work environment claim. This Court reaches this conclusion for three reasons.

Foremost, only Lieutenant Oenbrink's offensive comment was made in the presence of the Plaintiffs. *See Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1047 n. 9 (7th Cir.2000) (recognizing that comments heard "though the grapevine" or "second-hand" are not sufficiently severe or pervasive so as to create a hostile work environment); *Hudson v. Norfolk S. Ry.*, 209 F.Supp.2d 1301, 1314 (N.D.Ga.2001) ("Nonetheless, it is well established that slurs and insults heard second-hand do not carry the same weight as those made directly to the plaintiff"); *Mitchell v. Carrier Corp.*, 954 F.Supp.

159. Doc. No. 33 at Ex. 8.

1568, 1577 (M.D.Ga.1995) (finding that the severe and pervasive prong of hostile work environment claims was diminished where a co-worker's racial epithets directed at a plaintiff were received second hand).

Secondly, after the Plaintiffs made it known that they were offended by Lieutenant Oenbrink's disparaging remarks, the offensive comments directed at their persons ceased. In that connection, Robert and Anthony Caruso testified as follows:

Q. Since that incident, I take it from reviewing your information here, Lieutenant Oenbrink has not made any racially or ethnically offensive remarks to you has he?

A. Not a one.

Robert Caruso Deposition (Doc. No. 37) at 200.

Q. Has Lieutenant Oenbrink since that day made any other comments to you that were derogatory towards your Italian–American heritage?

A. No.

Anthony Caruso Deposition (Doc. No. 38 ) at 137.

This is fatal to the Plaintiffs' claim because it "is repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment and not simply some magic number of racial or ethnic insults." *Miller*, 277 F.3d at 1276 (internal citations and quotations omitted).

Finally, this Court finds the charge that the Defendant refused to allow the Plaintiffs to bear the insignia of the Italian American Police Officers Association implausible. With respect to Robert Caruso, the record reflects that he has no complaint in that regard.

Q. Are you making any type of a complaint about not being able to wear this insignia . . . ?

A. It wasn't brought to my attention. Nobody has ever said anything to me about that insignia.

Q. Okay. So that's not a complaint of yours?

A. No.

Robert Caruso Deposition (Doc. No. 37) at 257.

In fact, Robert testified that on certain occasions he does wear the Italian American insignia on his uniform. *See id.* at 259–260.

Similarly, with respect to Anthony Caruso, the record reflects that his charge regarding the Italian American insignia is tenuous at best.

Q. And it was Jim Frazier who told you couldn't wear it?

A. Yes.

Q. Did you speak to anyone else about that issue?

A. I don't believe so, no.

Q. Have you ever spoken, for example, to Chief Crawford regarding your ability to wear that insignia?

A. No, I have not.

\* \* \* \* \* \*

Q. Have you attempted to wear the insignia since that time?

A. No, I don't believe so.

Q. Has any disciplinary action ever been taken against you because of wearing the insignia?

A. No.

\* \* \* \* \* \*

Q. Do you know of anyone else employed with the City of Coca that wears the Italian–American insignia on their uniform?

A. No.

Q. Were you aware that Bob Caruso wears one on his uniform?

A. I haven't seen Bob in a uniform in years, so I couldn't tell you.

Q. Would it surprise you that he testified that when he wears his dress uniform, he wears the insignia on there?

A. It wouldn't surprise me at all.

Q. Would it surprise you to learn that no one has ever told him he can't wear it?

A. No, it wouldn't surprise me at all.

Anthony Caruso Deposition (Doc. No. 39) at 195–197.

In light of the foregoing, this Court finds that the Plaintiffs have not alleged facts which are sufficiently severe or pervasive to alter the terms and conditions of employment and create an objectively discriminatory abusive working condition. Accordingly, this Court need not consider the issue of whether the employer is responsible for such environment under either a theory of vicarious or direct liability.

## V. CONCLUSION

Based on the foregoing, it is **ORDERED** that:

1. The Defendant's, the City of Cocoa, Florida, September 20, 2002 Motion for Summary Judgment on the Claims of Anthony Caruso (Doc. No. 26) is **GRANTED**.

2. The Defendant's, the City of Coca Florida, September 20, 2002 Motion for Summary Judgment on the Claims of Robert Caruso (Doc. No. 29) is **GRANTED**.

3. The Plaintiff's, Anthony Caruso, September 20, 2002 Motion for Partial Summary Judgment (Doc. No. 24) is **DENIED** as moot.

4. The Plaintiff's, Robert Caruso, September 20, 2002 Motion for Partial Summary Judgment (Doc. No. 25) is **DENIED** as moot.

5. The Clerk shall enter a final judgment providing that the Plaintiffs, Anthony Caruso and Robert Caruso shall take nothing on their claims against the Defendant, the City of Cocoa, Florida. The judgment shall further provide that the Defendant shall recover its costs arising from this action.

6. This case shall be removed from the July 2003 trial calendar.

7. The clerk is directed to close the case.

8. This Court reserves jurisdiction to rule on the Plaintiffs', Anthony and Robert Caruso, Motion for Sanctions Against the Defendant for Failure to Attend Mediation (Doc. No. 87).